Sandra L. Jonas 035824
Shifa Alkhatib | 031149
**HKM EMPLOYMENT ATTORNEYS**
1 N. 1st Street, Suite 711
Phoenix, Arizona 85004
Phone/Fax: (480) 896-2636
sjonas@hkm.com
salkhatib@hkm.com
Attorneys for Plaintiff

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Arana, an individual | Case No.: |
| Plaintiff, | |
| vs. | COMPLAINT |
| Bar-S Foods Co., a Delaware Corporation Headquartered in Arizona | (Jury Trial Requested) |
| Defendant. | |

Plaintiff Richard Arana ("Mr. Arana" or "Plaintiff") by and through his undersigned counsel, files this Complaint against the Defendant Bar-S Foods Co. ("Bar-S Foods") or "the Company") pursuant to Federal Rules of Civil Procedure ("FRCP"), Rules 3, 7, and 8(a) and hereby states and alleges as follows:

### I. **PARTIES**

1.     Plaintiff Richard Arana is, and has been at all times material to this Complaint, an adult resident of the State of Arizona.

2.     Defendant Bar-S Foods is, and has been at all times pertinent to this

COMPLAINT - 1

Complaint, a Delaware Corporation with its principal place of business located at 18700 Hayden Rd. Suite 545, Scottsdale, Arizona 85255. Defendant Bar-S Foods conducts business in Arizona. It is registered as F00267521.

## II.    JURISDICTION AND VENUE

3.    This Court has original federal question jurisdiction under 28 U.S.C. § 1331 for the claim brought under the FLSA, 29 U.S.C. § 201, *et seq.*

4.    This Court has supplemental subject matter jurisdiction over the state and common law claim as set forth below under 28 U.S.C. § 1367, because the claims arising under state law are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

5.    This court has personal jurisdiction over Defendant as Defendant is registered to do business within the State of Arizona and is headquartered in Arizona. The Defendant can be served through its registered agent, Capitol Corporate Services Inc., which is located at 8825 N. 23rd Ave., Suite 100, Phoenix, AZ 85021.

6.    Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) since the Company is headquartered in this judicial district, and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

7.    At all times material to this Complaint, Defendant Bar-S Foods was the employer of Mr. Arana as that term is defined in the FLSA and A.R.S. § 23-350(3) and used in A.R.S. § 23-1501.

### III.   FACTUAL ALLEGATIONS

8.   Bar-S Foods is part of the Sigma brand portfolio. According to its website, Bar-S Foods is a national value brand of meat products, such as bacon, hot dogs, sausages, lunchmeat, and other packaged meats.

9.   On October 21, 2019, the Company hired Mr. Arana as its Director of Human Capital – a title that was changed to Director of Talent and Culture Partnerships U.S., and later to Director of Talent and Culture Partnerships Operations.

10.   Mr. Arana reported to the Divisional Vice President of Talent and Culture, Cindy Torres.

11.   Mr. Arana was responsible for aligning the Talent and Culture programs and initiatives with Company business objectives in his assigned units.

12.   His direct reports included Talent and Culture managers across the country, with whom he held meetings every other week to stay apprised of ongoing employment matters, such as workers' compensation, employee leave, investigations, disciplinary issues, terminations, unemployment applications, etc.

13.   He also provided valuable coaching and guidance on particularly complex issues that Plant Division Vice Presidents (DVPs) escalated to Mr. Arana and that required prompt resolution.

14.   Mr. Arana's approachable, professional demeanor and solutions-oriented perspective made him very well-liked by his internal clients and direct reports.

15.   When Mr. Arana joined the Company, he noticed a lack of uniformity in the

policies and procedures across the Company. This was attributable, in part, to the Company growing through acquisitions.

16.    For example, in one region, the employee handbook of a predecessor company (predating its acquisition by Bar-S Food Co.) was still in use. Mr. Arana therefore undertook the effort to prepare a Company-wide employee handbook with consistent policies and procedures.

17.    Mr. Arana identified other issues with the Company's policies and procedures, too.

18.    For example, before Mr. Arana joined the Company, it was not consistently utilizing E-Verify, which is an electronic system for verifying one's eligibility to work in the United States.[1]

19.    Mr. Arana standardized the Company's hiring practice to require the use of E-Verify for all new hires going forward.

20.    Every year that he was with the Company, Mr. Arana earned an annual performance bonus.

**A. Mr. Arana Discovers Illegal Activity by the Company and Reports it to His Supervisor, Ms. Torres.**

21.    Mr. Arana learned that employees were complaining that the Company was

---

[1] The Legal Arizona Workers Act ("LAWA"), also referred to as the "Employers Sanction Law," prohibits Arizona employers from hiring undocumented workers and requires all Arizona employers to use the federal government's E-Verify system for new hires beginning on or after January 1, 2008. *See*, A.R.S. § 23-212.  This law applies to Bar-S Foods because it is headquartered in Arizona and is, therefore, an Arizona employer.

not paying them for all hours worked.

22. Mr. Arana discovered that the source of the unpaid wages was the Company's practice of automatically deducting meal breaks from workers' hours even when employees worked through those breaks.

23. As a short-term solution, Mr. Arana instructed the Talent and Culture managers, Emily Baker, Brooklyn Mancipe, and Oneida Woods, to manually correct any timecards in their department that reflected incorrect deductions and to notify other supervisors to do the same in their respective departments until the Director of TR corrected the issue in the timekeeping system.

24. Mr. Arana reported to Ms. Torres that the Company's timekeeping system was automatically deducting time and resulting in unpaid wages, and that the Company had to fix the issue.

25. To Mr. Arana's knowledge, the Director of Total Rewards ("TR"), who was responsible for payroll and benefits, was the only person who had access to adjust the settings in the timekeeping system to prevent the automatic deductions going forward.

26. The Director of TR represented that she would address it.

27. Months later, however, Mr. Arana discovered the issue was ongoing and employees were still complaining that they were not being paid for all hours worked.

28. During various meetings where Ms. Torres and the Director of TR were present, Mr. Arana repeatedly vocalized that the Company needed to correct the systemic automatic deductions, which the Company knew was resulting in unpaid

hours.

29.    Meanwhile, Mr. Arana was overseeing a Form I-9 audit, which was conducted by Robert Griggs, owner of VerifyI9 LLC.

30.    Ms. Torres was aware that Mr. Arana was overseeing this audit.

**B. <u>Ms. Torres Issues a Retaliatory "Final" Written Warning to Mr. Arana as a Threat to Silence Him.</u>**

31.    In August of 2024, Ms. Torres accepted a different position within the Company, but continued in her role of DVP of Talent and Acquisition until the Company hired her replacement, Emilie Grombacher.

32.    Ms. Grombacher was hired on September 16, 2024.

33.    On October 15, 2024, Ms. Torres met with Mr. Arana.

34.    During this meeting, she blindsided Mr. Arana by issuing him a "final" written warning.

35.    This was the first time Mr. Arana received any written warning from the Company. In fact, Mr. Arana had received recognition and rewards for his contribution to the Company on multiple occasions during his tenure, including praise from both the CEO and Company President, Jesus Lobo and Warren Panico.

36.    The items that Ms. Torres addressed as the basis for the "final" written warning were minor, random, and in some cases, dated back *years*.

37.    Mr. Arana questioned how Mr. Torres was issuing him a "final" warning when he had never had a warning before.  that on the substance of the warning, which consisted of matters that were minor, random, and in some cases, were from years

prior.

38.    Indeed, Ms. Torres was not even Mr. Arana's supervisor anymore. Ms. Grombacher was. Had Ms. Torres felt there were issues with Mr. Arana's performance, she should have and could have addressed them with him in a timely manner while she was his supervisor.

39.    Ms. Torres instructed Mr. Arana to sign the warning.

40.    Mr. Arana, who was still processing this abrupt and harsh action, requested time to review the warning.

41.     Although a DocuSign link to the "final" written warning was sent to Mr. Arana's email, it was recalled just a couple of days later, before Mr. Arana had clicked on the link to view it.

42.    Mr. Arana suspected that Ms. Torres had abandoned the illegitimate "final" written warning, but he felt as though he had a target on his back and believed he was being retaliated against for speaking up about the illegal pay practice.

## C. Mr. Arana Escalates His Whistleblower Reports to the Company's In-House Counsel, Who Also Threatens Mr. Arana.

43.    Days later, Mr. Arana received very alarming news about another illegal activity by the Company. Mr. Griggs informed Mr. Arana that the Form I-9 audit revealed a large number of the Company's employees appeared to have provided documents during their hiring process.

44.    Indeed, the documents were clearly fraudulent on their face. For example, in many instances, the dates of birth dated back to the 1940s and even as far back as

COMPLAINT - 7

the 1920s in one case suggesting that the Company had been willfully ignorant when it hired those undocumented workers – before Mr. Arana's tenure with the Company.

45. Mr. Arana immediately recognized the gravity of the situation and requested Mr. Griggs prepare a risk analysis.

46. On October 23, 2024, Mr. Griggs provided the risk analysis report ("Undocumented Worker Risk Analysis"), which revealed that the Company was employing at least 195 undocumented workers.

47. Given Ms. Torres's retaliatory response to his reports about the Company's illegal pay practices, Mr. Arana escalated his reports of the Company's illegal activity to the Company's only in-house attorney, Senior Corporate Counsel, Monisha Roberts.

48. Ms. Roberts responded that she was on vacation and would reach out to Mr. Arana the following day.

49. The next day, however, she failed to contact Mr. Arana.

50. On October 25, 2024, Mr. Arana reported the Company's illegal activities to Ms. Roberts in an email. ("Whistleblower Email"). The Whistleblower Email included the following:

(A) Behavior by Company leaders in the Talent and Culture department that clearly violated Company policy but did not result in written warnings. This included violations of the sexual harassment policy. (This supported the fact that Ms. Torres had retaliated against Mr. Arana when she issued the "final" written warning.)

(B)  The Company's illegal automatic deduction of meal breaks that was resulting in unpaid hours and its refusal to correct the issue despite Mr. Arana's repeated reports to Ms. Torres;

(C) The Company's widespread employment of undocumented workers.

51.     Ms. Roberts contacted Mr. Arana via a Teams video call shortly after he sent the Whistleblower Email.

52.     Mr. Arana shared his screen with Ms. Roberts and showed her the Undocumented Worker Risk Analysis.

53.     Ms. Roberts demanded to know why Mr. Arana had brought those issues to her and asked what he was hoping to accomplish.

54.     Mr. Arana explained that he wanted to keep his job and correct the Company's illegal activity going forward, but he was facing retaliation for speaking up.

55.     Mr. Arana reported Ms. Torres for issuing a retaliatory "final" written warning, which seemed designed to threaten him with termination if he continued to speak up about illegal activity by the Company. He also reported that the retaliatory "final" written warning jeopardized his ability to receive his annual bonus.

56.     Ms. Roberts pressed Mr. Arana about what he was going to do if the Company did not address his concerns.

57.     Mr. Arana responded that he would do the right thing and "go to the authorities" about the Company's illegal activity.

58. Ms. Roberts responded by asking if Mr. Arana wanted a separation agreement.

59. He responded that he wanted to keep his job and correct the Company's illegal practices.

60. Days later, on November 1, 2024, the Company revived the retaliatory "final" written warning, resubmitting it to Mr. Arana via DocuSign for his signature.

61. Mr. Arana reported this to Ms. Roberts, and she advised him to address it with his supervisor, Ms. Grombacher.

62. Mr. Arana complied with these instructions and that same day, shared his concerns about the "final" written warning with Ms. Grombacher. They agreed to continue the conversation in a second meeting.

63. Ms. Grombacher requested Mr. Arana meet with her on November 8, 2024 at the corporate office. Mr. Arana assumed this meeting was to continue the discussion about the "final" written warning.

**D. The Company Promptly Terminates Mr. Arana in Retaliation for His Protected Whistleblower Reports.**

64. Mr. Arana arrived at the meeting to find Ms. Grombacher with Ms. Roberts.

65. They presented Mr. Arana with a separation agreement – just as Ms. Roberts had threatened would happen when Mr. Arana declared that he would go to the authorities if the Company did not correct its illegal activities.

66. Ms. Roberts and Ms. Grombacher did not reference any reason for his termination, so Mr. Arana asked why he was being terminated.

67. Puzzled, they looked at each other and a long silence filled the room.

68. Eventually, Ms. Grombacher stated, "Performance issues."

69. This was a pretextual reason for Mr. Arana's termination. In reality, the Company terminated Mr. Arana in retaliation for his complaints about the illegal pay practice and widespread employment of undocumented workers.

70. The Company's illegal termination of Mr. Arana caused him to suffer financial harm, including lost wages (back pay including his bonus and front pay) and lost benefits.

71. Mr. Arana also suffered significant emotional distress from being wrongfully ousted from his job right before the holidays.

## IV.    CAUSES OF ACTION

## COUNT I – FLSA RETALIATION

1. Mr. Arana realleges the allegations set forth above as if fully stated here.

2. Section 15(a)(3) of the FLSA states that it is a violation for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

3. Mr. Arana engaged in activity protected by the Fair Labor Standards Act ("FLSA") when he:

COMPLAINT - 11

(A) Repeatedly complained to Ms. Torres that employees were not being paid for all hours worked because of the Company's practice of automatically deducting meal breaks.

(B) Repeatedly urged the Company to correct the Company's timekeeping system to prevent the automatic deductions and ensure employees were properly paid for all hours worked;

(C) Complained to Ms. Roberts that, despite his numerous reports to Ms. Torres and the Director of TR, the Company refused to change the timekeeping system to ensure employees were paid for all hours worked.

(D) Reported to Ms. Roberts that he would go to the authorities if the Company did not correct its illegal activity.

4. Ms. Torres issued Mr. Arana the illegitimate "final" written warning because of his repeated complaints about the Company's illegal pay practice that violated the FLSA.

5. The Company terminated Mr. Arana because he complained to Ms. Roberts about Ms. Torres's retaliatory "final" written warning, as well as the Company's refusal to correct its illegal pay practice that violated the FLSA.

6. As a result of the Company's unlawful FLSA retaliation, Mr. Arana has suffered damages, including lost wages, benefits.

## COUNT II – WHISTLEBLOWER RETALIATION
### The Arizona Employee Protection Act ("AEPA")
### A.R.S. § 23-1501(A)(3)(c)(ii).

7.    Mr. Arana realleges the allegations set forth above as if fully stated here.

8.    The following reports by Mr. Arana constitute protected activity in that he reported activity that he reasonably believed (and, in fact, did) violate Arizona law:

(A) Mr. Arana's repeated reports to Ms. Torres that the Company was illegally failing to pay employees for all hours worked and urging the Director of TR to correct the system.

(B) Mr. Arana's Whistleblower Email to Ms. Roberts in which he reported, *inter alia*, that the Company was illegally employing undocumented works and failing to pay all wages due employees;

(C)  Mr. Arana's conversation with Ms. Roberts on October 25, 2024 in which he reported:

 i.  The Company's illegal pay practice of automatically deducting meal breaks when employees worked through their breaks and its refusal to correct the issue;

 ii.   The Company's illegal employment of undocumented workers;

 iii.  Ms. Torres's unlawful retaliation against Mr. Arana in the form of the illegitimate "final" written warning.

9.    The Company's knowing employment of undocumented workers did, in fact, violate Arizona law. *See* Arizona Legal Workers Act (A.R.S. § 23-212).

COMPLAINT - 13

10.    The Company did, in fact, violate Arizona wage laws when it knowingly failed to pay employees for all hours worked by automatically deducting meal breaks regardless of whether employees worked through their breaks. *See*, A.R.S. §§ 23-351; 23-352).

11.    Ms. Torres did, in fact, violate Arizona law by retaliating against Mr. Arana in the form of issuing the "final" written warning that ultimately resulted in his retaliatory termination. *See* A.R.S. § 23-1501(A)(3)(c)(ii).

12.    Mr. Arana's whistleblower report to Ms. Torres was to a qualifying individual, as Ms. Torres was Mr. Arana's supervisor and had authority to investigate and prevent further violations of the law. Specifically, Ms. Torres had the authority to order the Director of TR to correct the automatic deductions of meal breaks.

13.    Mr. Arana's whistleblower report to Ms. Roberts was also to a qualifying individual, as she was the Company's sole in-house counsel and had authority to investigate the illegal pay practices, the employment of undocumented workers, and Ms. Torres's retaliation against Mr. Arana, and prevent further violations of the law.

14.    Ms. Torres issued the "final" written warning in retaliation for Mr. Arana's protected whistleblower reports to Ms. Torres regarding the ongoing illegal pay.

15.    The Company terminated Mr. Arana because of his protected whistleblower reports to Ms. Torres and Mr. Roberts, as described above.

16.    Mr. Arana has suffered damages, including lost wages (back pay and front pay), benefits, compensatory damages, significant emotional distress in an amount to

be determined at trial.

17.    The Company's actions are egregious and thus support an award for punitive damages.

## V.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mr. Arana demands trial by jury in this action of all issues so triable.

## VI.    PRAYER FOR RELIEF

Based upon the foregoing, Mr. Arana requests judgment against Defendant Bar-S Foods Co. and prays for the following relief.

1. Lost wages, including back pay and front pay;

2. Compensatory damages;

3. Emotional distress damages;

4. Statutory fines and penalties;

5. Punitive damages;

6. Reasonable attorneys' fees and costs incurred in the prosecution of this action;

7. Prejudgment interest on all amounts for which prejudgment interest is legally allowable, at the highest lawful rate;

8. Post-judgment interest at the highest lawful allowed for all amounts, including attorneys' fees, awarded against Defendant;

9. Taxable costs; and

10. Any further relief that the Court deems just and reasonable.

RESPECTFULLY SUBMITTED this 29th day of January, 2025:

**HKM Employment Attorneys, LLP**

By:
Sandra L. Jonas
Shifa Alkhatib
*Attorneys for Plaintiff*